IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DOMENICO GIOTTA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 10-cv-1828 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge |
| MICHAEL J. ASTRUE, | ) | Arlander Keys |
| Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Domenico Giotta ("Mr. Giotta" or "claimant"), moves this court for summary judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security (the "Commissioner"), who denied his claim for Supplemental Security Income ("SSI"). In response, Defendant Commissioner asks the Court to deny Mr. Giotta's motion and to remand for additional development at Step Five. For the reasons set forth below, the Plaintiff's motion for summary judgment is GRANTED, and the case is REMANDED to the Commissioner for further proceedings.

## PROCEDURAL HISTORY

Mr. Giotta filed an application for SSI on January 30, 2007, alleging that he became disabled, as of March 11, 2005, because of a back injury sustained at work. R. 107-109. The Commissioner denied Mr. Giotta's claim initially and again upon

reconsideration. R. 63-66, 73-77. Mr. Giotta subsequently filed a Request for Hearing before an Administrative Law Judge ("ALJ"), and his case was assigned to ALJ John D. Kraybill. R. 78. The claimant appeared and testified at a hearing held on July 9, 2008. R. 12. ALJ Kraybill issued a decision on September 9, 2008, denying Mr. Giotta's claim for benefits. R. 9-19. He found that Mr. Giotta retained the capacity to perform a significant number of jobs, such as assembler, touch up inspector, or filling machines operator. *Id.* On July 10, 2008, claimant sent a letter to the ALJ questioning the vocational expert's opinion and requesting additional information. R. 183-184. There is no indication that the ALJ responded to this letter in the record. Subsequently, on September 23, 2008, Mr. Giotta appealed the Commissioner's decision. R. 7. On January 23, 2010, the Appeals Council denied Mr. Giotta's request for review, making ALJ Kraybill's decision the final Agency decision. R. 1-3; *see* 20 C.F.R. §416.1481.

## BACKGROUND

### A. Medical Evidence

The record shows that, on March 11, 2005, Mr. Giotta injured his back while lifting cabinets at work. R. 210. More specifically, he suffered a herniated lumbar disc at the L5-S1 level on the left side. *Id.* Mr. Giotta initially received physical therapy, medication, and later, epidural steroid

2

injections to treat his back injury. *Id.* Mr. Giotta reported to treating orthopedic surgeon, Dr. Charles Slack, that he only had a few days relief of the symptoms after the injections. R. 259. On October 11, 2005, Mr. Giotta underwent a left L5-S1 lumbar disc excision. R. 210. He attended physical therapy after the surgery and was "progressing satisfactorily postoperatively". R. 242. However, in January 2006, Mr. Giotta developed a right foot drop "without any history of trauma or injury to the leg." R. 237. Mr. Giotta also developed cellulitis of his right lower leg. R. 407.

In February 2006, Mr. Giotta continued to suffer ongoing symptoms in his back. *Id.* An MRI of the lumbosacral spine, conducted in February 2006, revealed post surgical back symptoms including: lumbar spondylosis with degenerative disc disease, left laminotomy change at the L5-S1 level, and postsurgical reactive fibrotic changes at the epidural space. R. 206-207, 288-289. In his March 2006 report, five months post-operation, Dr. Slack indicated that Mr. Giotta had weakness in his right foot and difficulty walking. R. 227. Dr. Slack recommended that claimant wear a brace due to weakness in his foot. *Id.* Dr. Slack opined that Mr. Giotta remained "temporarily totally disabled" and suggested that he be reexamined in six weeks, after treatment to stabilize his symptoms. R. 228.

In April 2006, Mr. Giotta saw pain specialist, Dr. Randy Chang, to relieve his back pain. R. 202-204, 281-282. Dr. Chang performed a caudal epidural steroid injection treatment "since it had been quite awhile since [Mr. Giotta's] symptoms [had] developed and there was no focal point of nerve compression." R. 283. Mr. Giotta returned to Dr. Chang two weeks later and reported that the "back pain was better," but the leg pain and weakness had not improved. *Id.* In May and June of 2006, Mr. Giotta participated in physical therapy and reported decreased symptoms. R. 299-323. However, the physical therapist noted that Mr. Giotta had progressed slowly "secondary to decreased compliance with attending [therapy] sessions." R. 314. A May 2006 MRI and EMG study, conducted by Dr. Glassenberg, showed that the right foot drop "is related to a peripheral nerve problem in the area of the right peroneal nerve and not related to the lumbar spine problem. R. 208.

After therapy, Mr. Giotta continued to complain of worsening leg pain associated with his foot drop. R. 210. On June 2, 2006, Dr. Alexander J. Ghanayem, an orthopedic surgeon who specializes in spines, examined Mr. Giotta and reviewed the medical records at the request of a worker's compensation insurance carrier. R. 208-209. Dr. Ghanayem concluded that "the etiology of this foot drop appears to be factors unrelated to [Mr. Giotta's] employment, work injury, or surgical

4

intervention." *Id.* He opined that the findings point to a peripheral nerve problem, which is not the nature of claimant's work injury. *Id.* He theorized that causes for the foot drop could include injuries such as prolonged pressure on a nerve, exhibited in patients that have passed out for extraneous reasons, or from the use of tight straps used for braces. R. 209.

Thereafter, on June 7, 2006, Dr. Slack opined that claimant's foot drop appeared to be related to a local problem around the peroneal nerve in the lower leg and not to Mr. Giotta's lumbar spine. R. 220. Dr. Slack indicated that Mr. Giotta would not require any other treatment for his back. *Id.* He ordered a functional capacity evolution ("FCE") to use as a guideline for Mr. Giotta's return to work. R. 220-221.

On June 14, 2006, Kevin Richardson, physical therapist and industrial rehabilitation specialist, performed Mr. Giotta's FCE. R. 307-311. The specialist opined that Mr. Giotta had "demonstrate[d] the physical capabilities and tolerance to function minimally between the medium-heavy and heavy categories of work (as defined by the US Department of Labor), which is indicative of two-hand frequent lifting of forty-three pounds from nine inches to waist level." R. 307. However, the specialist emphasized that "the results of this evaluation represent[ed] a minimal level of functioning for Mr. Giotta,"

because Mr. Giotta had demonstrated "submaximal effort" during the evaluation. *Id*. He concluded that Mr. Giotta was employable and was "capable of functioning at a higher category of work than he demonstrated." *Id*.

Consistent with the findings of the FCE, Dr. Slack wrote Mr. Giotta's insurance carrier, on June 29, 2006, informing them that Mr. Giotta was released to return to work with the ability to function minimally in the medium-heavy and heavy categories of work. R. 214. Dr. Slack noted that, after some time, Mr. Giotta might ultimately be able to function at a higher level. *Id*. On August 1, 2006, Dr. Slack advised the insurance carrier that the claimant was at "maximum medical improvement" and reiterated his medical opinion regarding claimant's limitations set forth in the previous letter. R. 213.

In January 2007, Mr. Giotta returned to Dr. Slack for the first time since June 2006. R. 210. Mr. Giotta complained of "difficulty with his back and [having] difficulty sleeping at night because of his pain, spasms in his back and right leg." *Id*. Mr. Giotta also told Dr. Slack that he was not working due to the pain interfering with his ability to function. R. 211. Dr. Slack opined that Mr. Giotta had "persistent low back derangement with postlumbar laminectomy syndrome status post L5-S1 lumbar disc excision and with a right foot drop." *Id*. He also noted that claimant appeared to have difficulty with any

sustained activities due to his back and leg pain. *Id.* He concluded that Mr. Giotta was "disabled from performing any gainful work activity on a permanent basis." *Id.*

In April 2007, Dr. David Bitzer, retained by the state agency, completed a residual functional capacity assessment ("RFC"). R. 379-386. Dr. Bitzer opined that Mr. Giotta could perform a range of work involving lifting no more than twenty pounds occasionally and ten pounds frequently and that he could stand and walk for at least two hours in an eight hour workday. *Id.* Dr. Bitzer rejected Dr. Slack's January 2007 opinion about Mr. Giotta's inability to work, noting that Dr. Slack's initial opinion, that Mr. Giotta could return to work with an initial work functionality at the medium to heavy level, was supported by the evidence on file. R. 385. Dr. Bitzer ultimately concluded that there was no objective evidence showing Mr. Giotta could not do sedentary work. *Id.*

Subsequently, Dr. Slack completed an RFC in June 2007. R. 390-397. This RFC limited Mr. Giotta to less than sedentary work, with additional postural and environmental limitations. *Id.* A year later, in June 2008, Mr. Giotta returned to Dr. Slack for a follow-up. R. 452. After conducting a physical examination, Dr. Slack again opined that Mr. Giotta had "persistent lumbar laminectomy syndrome with right foot drop" and

7

that he still remained "disabled from any gainful employment due to the difficulty with the sustained activities." R. 453.

B.  **Testimony at the Hearing**

   1.  **Testimony of Mr. Giotta**

Mr. Giotta, who was 42 years old when he filed his application for benefits and is now 48 years old, testified that he attended school through sixth grade. R. 34. Mr. Giotta is able to communicate in English and has been employed at various places. R. 18. His past work experience includes golf club bench assembly worker at the Northwestern Golf Company between 1986 and 1993; waiter for nearly a year; and punch press operator at Taylor Manufacturing between September 2004 and March 2005. R. 51, 52, 134. Mr. Giotta testified that, from 1997 to 2004, the period in which he did not report any earnings, he had been working for cash. R. 25.

While working at Taylor Manufacturing, Mr. Giotta injured his back flipping metal cabinets. R. 27. He received a worker's compensation settlement in the amount of $20,160 on October 30, 2006 for these back injuries. R. 179.

Mr. Giotta testified that, after undergoing back surgery, he developed a foot drop and cellulitis on his right leg. R. 24. He stated that he currently uses a cane and a foot and back brace, prescribed by his doctor, to prevent him from falling when the foot drops. R. 29, 30. Mr. Giotta explained that, because

8

of his condition, he can only walk half a block with a cane before getting tired and can only stand for about five minutes without the cane before he gets dizzy. R. 27-28, 31. Mr. Giotta gets tremendous pain around his lower back, shooting down to his legs, when climbing stairs. R. 24. He also indicated that he has no feeling in his right foot, which swells daily, and that he cannot move his toes on his right foot. R. 30. He testified that he can only sit for five to ten minutes at a time, and that he also has difficulty sleeping because of these symptoms and the medication he takes. R. 32. His limited sleep at night requires him to rest periodically during the day. *Id.*

Finally, Mr. Giotta testified that he has difficulty dressing himself, difficulty reaching and bending, and gets constipated occasionally for reasons other than his medication. R. 32-34. He then testified that he can no longer do some of the leisure activities he used to enjoy prior to his back injury, such as playing basketball, jogging, and riding a bike. R. 34.

### 2. Testimony of Dr. Walter G. Miller, Medical Expert

After reviewing the record, Medical Expert ("ME") Dr. Walter G. Miller opined that Mr. Giotta suffered from a "foot drop secondary to something that happened right at the peroneal nerve level." R. 40. However, Dr. Miller opined that there was not enough objective evidence to support a finding that Mr. Giotta had nerve abnormalities caused by his back injury. R. 41. He

9

also concluded that Mr. Giotta "doesn't have the characteristic findings of meeting a Listing in the sense of the back." R. 42.

On cross examination, Dr. Miller indicated that post laminectomy radiculopathy could limit an individual's ability to stand, sit, walk and lift. R. 47-49. However, Dr. Miller opined that for these limitations to be the result of radiculopathy, the individual must also have nerve abnormalities, demonstrated in an EMG abnormality, which he noted was not present in the record. R. 48. When questioned in regards to Listing 1.04(a) requirements, Dr. Miller opined that the clinical signs identified by counsel (for example, a straight leg raise on the right at thirty five degrees causing lower back and posterior leg pain) were not necessarily signs of a herniated disc, but that these ailments could be caused by the spondylosis in Mr. Giotta's back. R. 48-49. He noted that this determination depended on an analysis of other factors such as the EMG. R. 49. Ultimately, Dr. Miller questioned the accuracy of Mr. Giotta's self reported ailments because of "discrepancies in the record." R. 41-42. He concluded that Mr. Giotta could perform sedentary work consistent with Dr. Bitzer's conclusions and the FCE determinations. *Id.*

### 3. Testimony of Vocational Expert Terrance Gestloff

Vocational expert ("VE") Terrance Gestloff also testified during the hearing. R. 52. The ALJ asked VE Gestloff about a hypothetical individual who had the same background and education

as Mr. Giotta, who was limited to sedentary work that did not involve use of pedals, ladders, scaffolds or things of that nature, but required occasional bending, stooping, kneeling, crouching, and crawling. R. 52-53. The ALJ asked whether there would be jobs for such an individual within these limitations. R. 53. The VE responded that such an individual could not perform Mr. Giotta's past relevant work, which involved work within the functional range of light semi-skilled to medium. R. 52, 56. However, the VE opined that other work was available to the hypothetical individual, including: assembler, touch-up inspector, and filling machine operator. R. 53. In addition to the Dictionary of Occupational Titles ("DOT"), the VE also testified to the number of workers for each position in the Chicago area. R. 53-54. The VE stated that these jobs were unskilled and did not require a specific educational level. R. 53. He added that these jobs would allow for the use of a cane to ambulate to and from the workplace. R. 56.

On cross-examination, counsel for claimant asked the VE to name companies in the Chicago area that employed assemblers, touch-up inspectors and filling machine operators. R. 54-55. The VE responded that he could not name any company "at the top of [his] head." *Id*. When asked to assume that the hypothetical individual had difficulties bending and could never climb, balance, stoop, kneel, crouch, and crawl, the VE indicated that

that individual could perform the sedentary work he had identified. R. 55-56. Lastly, the VE testified that the hypothetical individual would be precluded from doing all of the jobs he identified, if the individual also had to lay down for twenty to thirty minutes after no more than a half hour to an hour of activity. R. 56.

C.  **The ALJ's Decision**

At Step One, the ALJ found that Mr. Giotta had not been engaged in substantially gainful employment since January 30, 2007. R. 14. At Step Two, the ALJ found that Mr. Giotta suffered from post lumbar laminectomy syndrome, right peroneal neuropathy without radiculopathy, and right foot drop. *Id*. At Step Three, the ALJ stated that Mr. Giotta "does not have an impairment or a combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." R. 14. The ALJ found that Mr. Giotta had impairments which could reasonably be expected to produce the alleged symptoms. *Id*. However, the ALJ concluded that Mr. Giotta's claims about the intensity, duration and limiting effects of these symptoms were not entirely credible. R. 17. The ALJ found that Mr. Giotta's claims were inconsistent with the objective medical evidence, which indicated that Mr. Giotta had reached his maximum medical improvement with the functional ability to perform sedentary work. R. 17, 213. The

ALJ also noted that he "[gave] the opinion of Dr. Slack, dated June 6, 2007, and a subsequent one dated June 26, 2008, little weight as [they were] inconsistent with the record and his own medical records." R. 17. The ALJ noted that Dr. Slack had referred Mr. Giotta for a FCE, which was completed in June 2006, and subsequently wrote in two separate reports that Mr. Giotta was released to return to work with an ability to perform medium to heavy work, consistent with the FCE. *Id.* The ALJ noted that, since June 2006, Dr. Slack had seen Mr. Giotta only twice – once in January 2007 and once in June 2008. *Id.*

The ALJ found "the opinions of the medical expert to be the most informed, consistent with the medical evidence of record, convincing, and consistent with the record as a whole, including the claimant's presentation at the hearing, and the questionable effort by the claimant at his FCE as documented in the record." *Id.* Thus, at Step Four, the ALJ found that Mr. Giotta had the RFC for a range of sedentary work with the use of a foot brace, as the medical expert had opined. *Id.* Finally, the ALJ found that Mr. Giotta was unable to perform any past work, as his past relevant work required a higher functional capacity. R. 17-18. However, the ALJ agreed with the VE, and, at Step Five, concluded that there were a significant number of jobs that existed in the national economy that Mr. Giotta could perform. R. 18-19.

13

## STANDARD OF REVIEW

A district court must affirm an ALJ's decision, if the decision is supported by substantial evidence and is free of legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that the Court may afford the claimant meaningful review of the ALJ's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

14

## SOCIAL SECURITY REGULATION

An individual claiming a need for SSI must prove that he or she has a disability under the terms of the Social Security Act. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's RFC, and must evaluate whether the claimant can perform his or her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Charter*, 55 F.3d 309, 313 (7th Cir. 1995). At Steps One through Four, the claimant bears the burden of proof; at Step Five, the burden shifts to the Commissioner. *Id.*

## DISCUSSION

**A.    The ALJ's Step Three Determination**

Mr. Giotta challenges the ALJ's cursory finding at Step Three that his impairments did not meet or equal the requirements of a Listing. In Step Three, an ALJ must determine whether the

impairments meet or equal one of the listed impairments in Appendix 1 of Subpart P. 20 C.F.R. § 404.1520(a)(4)(iii).[1] If a claimant's impairments meet the criteria of a listed impairment, the claimant is presumptively disabled. 20 C.F.R. § 404.1520(d). Even if a claimant's impairments do not meet the criteria of a listed impairment, the claimant can still be found to be disabled if his impairments medically equal the criteria of a listing. 20 C.F.R. § 404.1525(c)(5).

Here, Claimant argues that his ailments meet or equal Listing 1.04(a), which includes disorders of the spine resulting in compromise of a nerve root or the spinal cord. 20 C.F.R. 404, Subpt. P, App. 1, §§ 1.04(a). Specifically, the listing requires "evidence of a nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *Id.* The ALJ's two-sentence discussion of this question said only the following:

> I have evaluated the claimant's impairments in the context of the Listings and conclude that he does not manifest clinical signs and findings that meet the specific criteria of any of the Listings. In reaching this conclusion I have also considered the opinions of the Disability Determination Services (DDS) medical

---

[1] Appendix 1 lists the impairments that have been pre-determined to be severe enough to prevent a person from doing any gainful activity. 20 C.F.R. § 404.1525(a).

consultants who have evaluated this issue at the initial and
reconsideration levels of the administrative review process and
reached the same conclusion (20 CFR 416.927(f) and Social
Security Ruling 96-5p).

R. 14.

Mr. Giotta argues that the ALJ did not thoroughly evaluate whether he meets a Listing, as required by the Seventh Circuit. When determining whether the impairments meet or equal a listed impairment, "an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *See e.g. Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2002); *Ribaudo v. Barnhart*, 458 F. 3d 580, 583 (7th Cir. 2006). The court in *Barnett v. Barnhart* found that the ALJ's two-sentence discussion of his determination in Step Three was "inadequate and warrant[ed] a remand" even though it could be inferred which Appendix 1 listing the ALJ considered. 381 F.3d at 670. Here, like in *Barnett*, the ALJ failed to identify any listings corresponding to the severe impairments found in Step Two. It is imperative that enough information be provided in the ALJ's decision to ensure that this Court can determine whether the ALJ properly evaluated whether Mr. Giotta's impairments medically meet or equal any listed impairments. *See id.* at 670.

Furthermore, even if the ALJ did not find that any of Mr. Giotta's impairments medically meet listed impairments, there is

17

no indication that he engaged in an equivalence analysis.
Therefore, the ALJ's two-sentence consideration at Step Three,
like the ALJ's two-sentence consideration in *Barnett*, and his
lack of an attempt to engage in an equivalence analysis as
mandated by § 404.1526 is inadequate. For this reason, the case
must be remanded to the Social Security Administration so the
Agency can conduct a more thorough analysis of the evidence at
Step Three. Since the case is being remanded at Step Three,
there is no reason, at this time, to proceed to Claimant's
arguments regarding the ALJ's credibility determination, and
findings at Steps Four and Five.

**B.    Post-Hearing Request**

On remand, the Agency is to address claimant's counsel's
post-hearing request concerning the VE's opinions. In the July,
10, 2008 letter, claimant raises the following arguments for the
first time: that the film touch-up inspector position is
obsolete, and that the toy stuffer and assembler positions are
not located in the United States, let alone the Chicagoland area.
R. 183-184. He also requested that the VE provide "all
statistics, statistical summaries, reports, or compilations upon
which he relied on in forming his opinion as to the number of
jobs that exists in the labor market he cited." R. 184. The
letter also states that the VE "was unable to provide the names
of companies that these jobs were performed" during the hearing

18

and thus, "it would be difficult to give the [VE's] testimony much credence." R. 183. There is no indication in the record that the ALJ responded to this request.

An ALJ is not obliged to reopen the record when the claimant does not properly challenge the genesis for the VE's numbers and does not ask for substantiation at the hearing, but raises this discrepancy only after the hearing *Donahue v. Barnhart*, 279 F.3d 441, 447 (7th Cir. 2002). Here, in the post-hearing letter, Counsel points to several alleged discrepancies between the VE's conclusions and the DOT and requested that the VE provide the data he relied on in forming his conclusions. R. at 183-184. None of these discrepancies were explored during the hearing, nor did counsel request that the VE substantiate his conclusions, although he was afforded that opportunity. Therefore, the Court notes that the ALJ's failure to respond to this post-hearing request was not erroneous.

However, since this case is remanded on other grounds, and the Commissioner agrees that remand is appropriate for the purpose of the VE providing the data upon which he based his opinion as to the number of jobs which allegedly exist in the labor market, the VE should adequately provide the data upon which he relied in reaching his opinion on remand.

## **CONCLUSION**

For the reasons discussed above, the claimant's motion for summary judgment is GRANTED, and the case is REMANDED to the Social Security Administration for further proceedings.

Dated: June 3, 2011          E N T E R:

_____
ARLANDER KEYS
United States Magistrate Judge